Thank you, Your Honor. Sidney Powell for IAS. We ask the Court to vacate and reverse the judgment of the District Court, reinstate our fraudulent inducement claim, and render on our breach of contract claim. All of the issues boil down to a couple of contract provisions, primarily in Article II and then Section 4.3, I believe it is. The District Court completely misread the contract. It threw out the fraudulent inducement claim because it deemed the contract provision unclear, but Article II specifically starts out with, as a material inducement to the buyer to enter into this agreement and to consummate the transactions contemplated herein, the seller makes the following assertions that are correct and complete, and then that includes a number of representations and warranties, which includes the Article 2.3, that the covenants and consents, the consents will be valid and transferred. It's specifically 2.3c. That is the key provision in the contract. The contract also specifies — I'm sorry, what? You referred to 2.3. That's the provision that promised that there would be no breach? That's the provision that promises the consents will be transferred and they won't conflict with or result in a breach of any other contracts. What's the breach? The breach is that they didn't get a consent, so the contract that we had or that they had with their main — their main client that provided 35 to 45 percent of their business was called QBE. Their contract with that, they did not get a consent to make that contract assignable. If they had — But JBA and breach with QBE. If I understand 2.3 correctly, the promise is that by entering into the purchase agreement, JBA isn't breaching anything with, among others, QBE. Correct. What was the commitment that JBA made that they were breaching? It wasn't assignable without consent, and they did not get the consent ahead of time. The QBE contract was not assignable without consent ahead of time. And Mr. Buckley admitted that he knew that. He had also signed a consent himself for Bank of America to transfer the contract to QBE only a few months before, and he signed it two weeks before. I think we're confusing two different things. I apologize if I'm simply misreading 2.3, but I thought the idea of 2.3 is JBA, by agreeing to sell, isn't breaching its agreement with QBE. Is that the correct reading of 2.3? In part. It also requires — well, as soon as JBA signed that contract, it breached the QBE contract because it didn't get consent. The QBE contract says you've got to have consent to assign, otherwise this whole — our contract with you is void. Correct. Your position is since he didn't get consent, he breached the minute. Exactly. The whole — So that went to trial, right? The breach goes to trial. The breach case. The breach of contract went to trial. So didn't the district court, adopting opposing counsel's facts, conclude that independently you lose on your breach of contract because of a time bar? No, sir. In fact, we won the time bar on summary judgment, and they did not appeal it. Plus, the Article 2 representations and warranties, there is no time bar applicable to those at all. They run in — in continuously. I understand the latter argument, but the former, I thought that he had concluded that you didn't sufficiently in time — you didn't comply with whatever the 5.6 time bar. But you're saying you won that? So I'm just wrong on that? I believe you're wrong on that, Your Honor. I know there was a summary judgment issue on that. I know we won on that in summary judgment. I know they did not appeal that. To the extent it might have been slipped in the findings and conclusions, all those were actually submitted 30 days before the trial. Let's say it was slipped in. Let's say I'm right in having read those, and it's not — this isn't a gotcha argument, but if you didn't then brief it, that stands as an independent basis to affirm on the breach. We did — we did brief it. But how — why would you have briefed it if you thought you won it? To tell you that we won it. Okay. But when we go back and look and see if he made a finding that you are time barred? If — if it is in there — if it is in there as a conclusion of law, number one, it's — it's wrong. Number two, it's nothing you can rely on because he literally just rubber-stamped their findings and conclusions. And we've got a number of cases cited in the brief explaining that, you know, when the district court doesn't actually, you know, consider and do something, this court doesn't have to give it much weight, if any. And it would be an erroneous legal conclusion on top of that, and contrary to the terms of the contract. Let's say I agree that he was wrong to dismiss the fraud and inducement claims, but then he goes on in responding to the breach claim to say there's no fraud, Mr. Chief Justice. Would that have any preclusive effect backwards on whether or not the dismissal was right? Do you understand the question? I think I understand the question. I'm not phrasing my questions clearly. That's not false modesty. I know I'm not. But go ahead and try to answer. Well, the breach issue is controlled by the terms of the contract. Yes. And unless you read 4.3 as their safety net thing, which is extra-textual and just kind of pulled out of thin air, you have to find breach of contract by virtue of 2.3. QBE was the most material to the transaction. It provided 45 percent of their business. Even their experts said without QBE, you couldn't even value. They were very material, I think. Yes. Well, they're specified in the contract as material. There's a contract section that says the top five clients are material. I'm going to hear from opposing counsel how this wouldn't be particular enough as to when and where, because it seemed like you said the no-shop period, June, July, therefore. But I guess when I looked at that other section, you'll know at 4.3, it does seem that this is an odd purchase agreement. It sort of says you can't have anything that conflicts with the contract. On the other hand, if you don't get the consent to assign, then everyone's got to do reasonable efforts to get it later. And therefore, that would seem to me to be a triable issue. That may still mean it was error to dismiss at the outset, but then he goes to trial on the breach and he says, I ultimately don't think Mr. Buckley was fraudulent. And my question is, if you win on the dismissal problem, didn't the trial findings of fact that ensued still resolve whether there was any misrepresentation? No. I don't think so, because there's no way that we would have gone into this contract without believing he had consent to transfer the most material contract in the case. Everybody agreed that they were material, that Buckley knew they were material. Even Buckley's experts said, you know, the company has no value. You can't even value the company without QBE as an asset of it. And Buckley knew that they were not — I think he knew they were not going to transfer, and that's why he didn't ask consent. He said he never even intended to ask for consent, which we didn't know until the trial. There's no way he could have gone into this in good faith. And it's a plain breach of Section 2.3 because, again, those — that whole Article 2 is a material inducement to enter the contract. There's nothing — The inducement you say there was a fraudulent misrepresentation is that he's telling his counterpart that we're the number one vendor, we are the number one one, and yet at the same time, Gomez, the account holder, has a memo in June saying we're actually eight of nine? Exactly. That's one of the oral representations. What did the district court — how did it dismiss that as not even actionable? I wish I knew the answer to that. He just misread the contract and turned it upside down and said because of Section 4.3, it's not clear. There were red flags, and therefore, you don't have a fraudulent inducement claim. I mean, it really doesn't make a lot of sense to me, looking at it in hindsight. But Article 4 is a covenant provision that is totally different than Article 2, which is the material inducement provisions, and all the key provisions come under Article 2, including 2.2 on enforceability, 2.3, the noncontraventions and consents, 2.11, seller contracts, 2.12 is material customers, which would have included QBE, and 2.2, that there are no untrue statements of material fact or omissions by Mr. Buckley. And he warranted all those things as material inducements to enter this contract. Sotomayor, didn't 4.2 sort of put you on notice that Buckley might not be able to pull this off, where he says if I — if he can't secure the consent of this major client, then he'll work to provide it? I mean — There's nothing — there's nothing in the contract that goes — that takes you from being a material client to, oh, we'll just see if we can work this out later if it doesn't work out. That's what it says. Only that applies to leases. Pardon? That applied to the leases, because the QBE contract was assignable. It was perfectly assignable with consent. With consent. With consent. That's what it says. If I'm unable to secure the consent, then I'll work to provide the — But it's for non-assignable contracts. They knew that the leases were non-assignable. They might possibly be assigned, but as a general matter, the leases were completely non-assignable, and we knew that. But QBE was specified as a material client, and the contract said it was assignable. The whole purpose of it was to get the consents before the transaction closed. And for all the material clients. Right. But there's this inference. Well, it's more than an inference. It says if I didn't get the consent, then I'll try to get the consent or something. Well, the only way not to read 2.3 out of the contract completely is to recognize that it was an assignable contract to which 4.2 does not apply. Otherwise, 2.3 just disappears. Has QBE ever said that JBA is in breach? QBE — yes. Well, QBE just said we're not going to deal with IAS. We're not sending any new clients at all. That's a different statement. Fair enough. But that's different from QBE holding JBA in breach, either by filing a suit or sending a letter. Oh, no, it did not. Has QBE ever said it? It sent a termination letter. But Buckley never even — It's not a breach. Right. Buckley never even sought consent from QBE even after the transaction. But QBE didn't require JBA to do that. I know IAS wanted them to do that. But again, I read 2.3 as saying that there should be no breach of any agreement, including the agreement between JBA and QBE. Let's start there. Do we read 2.3 the same, or are we reading it differently? I think we may be reading it differently. I think so. In 2.3, the very minute that Mr. Buckley signed this contract, he was in breach of the QBE contract and in breach of his warranties to IAS. So we do agree on the reading of 2.3? That the contracts would be assignable. Well, 2.3 is triggered if QB — if JBA breached its agreement with QBE. Correct. Right. And if JBA breached its warranties and inducements to IAS. Well, let's focus on the breach of the agreement part. Disagreement? Of the QBE agreement with JBA. Okay. QBE not continuing its relationship with IAS, or frankly, for that matter, with JBA, that is different from QBE finding JBA in breach, is it not? Ostensibly, yes. And QBE has never said that JBA is in breach. Is that correct? QBA refused to do — continue to do business with IAS because of the transfer. Refused to do business while not finding a breach. Right. I don't want to go somewhere else. I don't want insurance anymore. And it started doing that within, like, two days after the assignment or the contract. As soon as Mr. Buckley notified QBE that he was — had sold the company to IAS. By the way, he never even sought consent from QBE, even after the assignment. He just notified them of the sale, and they didn't send any more claims and didn't want to deal with a new vendor. And if he had done that beforehand, the whole point is, if he had done that beforehand like he was supposed to under the contract, under his representations, warranties and inducements, we would have known that and not proceeded with the sale. That's your false inducement theory. What is the — sort of the strongest false statement that you're alleging? Well, there's several. Mainly the material inducements in the contract themselves, that QBE was their number one client, that the revenues were increasing and would continue. Why does it matter whether QBE was their number one — I'm sorry. It provided 45 percent of their business. Without QBE, it's undisputed there would have been no sale at all. I thought the statement was that JBA was QBE's number one provider. Right. That's what — yeah. He was saying JBA was QBE's number one provider. I may be getting my alphabet soup mixed up, but — Why does it matter whether JBA was QBE's top provider or one of their smaller providers? Because it was such an important client, the business had no value without it. That's his own expert. But that has nothing to do with how important JBA is to QBE. Let's say JBA was QBE's smallest provider. You see what I'm getting at? Then it wouldn't have been a material client under the contract or as a factual matter. Do you feel like you've answered his question? I think that's up to him. Your time's up. Yes, sir. So that's perfect. We'll hear from the closing counsel. May it please the Court. David Kelman for JBA. Mr. Buckley, thank you very much for hearing us. Two things I want to point out, and Your Honors have mentioned it in your questions so far, then I want to answer some of the questions from our standpoint that the panel asked. First off, this was a dismissal on the pleadings of the fraudulent inducement claim without prejudice. Specifically, the Court gave instructions to IAS how they could cure and allowed an amendment. But the amendment never came. It didn't happen within 21 days under Rule 15. It didn't happen until five months, almost five months later. That was 11 months after the pleading deadline, a month after discovery had closed, and on the same day that summary judgments were filed in that deadline. That was the request to amend was denied, and properly so. The Rosenwald case, Judge Clement, your case, dealt precisely with that or those kinds of situations and the factors under Foreman v. Davis. And we meet pretty much all of them, dilatory action, late prejudice, discovery is closed, you can't get back into it, and the like. So that is number one. Even if they were right on the fraudulent inducement claim, and they're not, and I'll demonstrate to you, I hope, why they're not, they would have lost in any event. Finally, they can't. Robertson, just a little bit. Even if they're right in that their allegations were sufficiently particular, it still would have been subject to dismissal? Your Honor, what I'm saying assume that the complaint before the Court wasn't sufficiently particular. Perhaps I spoke carelessly. I do not mean that, and I think that would clearly be improper. What I am saying, though, is the case progressed, and it progressed with an opportunity to amend. It wouldn't amend if it were sufficiently particular as a matter of law, right? That is correct. That is correct. But if you look at that issue, and let's take that on first, and this Circuit has dealt with almost precisely this situation in a dismissal on the pleadings in a misrepresentation and breach of warranty case before. It's Lone Star Fund v. Barclays Bank, which we cite. I have to confess to you, I was counsel for the disappointed litigant in that case, so unfortunately I know it a little bit too well. But here's what happened. Barclays Bank, back in the day when mortgage-backed securities were the big thing, packaged a group of $60 million worth of those, sold them to Lone Star Bank with a representation and warranty that none of the mortgages, not one of them, had ever been in default for a period of more than 30 days and were not in default. That turned out not to be true. It turned out, in fact, they had never looked at that issue, and thousands were in default. There was a cure provision, however, and it said that if any are in default, then the remedy is going to be, and what you're going to be entitled to is we'll replace each of those. Lone Star sued to set aside the entire transaction, just like you see here, asking for the benefits of the transaction, then get it on contract so you keep the benefits, and then additionally you get damages. And that's their claim here. And this is Judge Jones for a unanimous panel held that said, no, no, this doesn't work. You have to look at the cure provision and read it with the warranties. And while reading the warranties alone might very well lead you to the conclusion that there was a breach, when you look back into the cure provision, the parties certainly anticipated that everything was not going to be perfect, and if they did that, then the allegations of the breach of the warranty on the pleadings could be dismissed, and that's what happened in that case. This case is almost exactly the same. 4.2 is a remedy factor for 2.3. Not all of these claims, and by the way, let's, the facts in this part are undisputed, and additionally, the contract on the pleading ground showed it, and that was in, that was attached to the complaint that, from which the dismissal order was made. And in that, two things were important. First off, all of these contracts had been given to IAS up front, three and a half months before the closing, two and a half months before the closing. So they knew that it was not assignable, and when we say not assignable, let's be careful there. That's not what the contract said. The GSA said any attempt to assign would be void if you didn't get consent. There was discussion between the parties and that they would not try to get consent beforehand because of the nondisclosure agreement, which said you couldn't disclose the nature of the transaction to anyone. But even accepting your client's theory, those are red flags, but it's triable. It could potentially be triable. That's not what Judge Jones held in Lone Star v. Barclays Bank, though. And that was a dismissal on the pleadings case just exactly like this one. There were more than red flags in this instance. Let's also talk a little bit, Your Honor, though, about the idea of it being number one. First off, you know, eventually this case was tried, and tried on that theory, so we know how the evidence turned out, but let's go back and take a look at the pleading. The LOI, which was also amended to the or put to the pleading as well, properly considerable on a motion to dismiss, provided very clearly that no representations could be relied upon. That alone on the pre-agreement representations could be relied upon. That alone would take that out of the consideration entirely. But the truth of the matter is fraud eventually got tried in this case. Over our objections, we filed a motion in limine to keep it out. They raised it as a defense to the breach of contract claim, to their contract claim, actually, and our defense, which was a statute of limitations defense, and on the employment agreement. And it was completely tried, and if you don't have to rely on me on that, if you look at their requested findings of fact and conclusions of law, you will see that they've tried, they asked the Court to make findings on their fraudulent inducement claim, including the damages amount as well. So it did get tried. The interesting issue is those claims were rejected for very valid grounds on a number of things. First and most importantly is the GSA agreement itself. Now, to prove damages in Texas law. Breyer. Just again, just trying to merge the two issues of the dismissal and then the breach, I see them as separate. Is your position that the resolution of the breach would have made any errors to dismissal precluded? Is that or? Your Honor, I can't say that completely. Because when the Court says, I don't see that he committed fraud that would have allowed them to terminate his contract, it seemed to me the Court was saying, I already decided the fraud issue. Yes, sir. Not that you so, yeah, so not resolving it factually based on the trial events. I'm with you. Okay. But the Court went ahead and made findings on those in any event, positive findings for us as well, which is unique. This doesn't happen very often. When you have a dismissal and a pleading, then you try the case and you know how it comes out. This is, this is, I, will it be no, sir, not a one, and I don't think one exists, and we looked. So you heard my question to opposing counsel whether or not in the Court's findings of fact as a result of the trial, there were independent-based grounds for its conclusion that particularly time bar or insufficient showing of damages. Was I, am I right about that? Yes, sir. Or is it summary judgment? You are absolutely right about that. And let me, let me talk about that briefly. No matter what happened in this case, the IAS agreement, even if there was a breach, had a limitation on liability. This is the PSA. I said ISA, the PSA. And it was specific, and it is, it's provision, it's Article V of the PSA. And if you look at it, it, they say, by the way, it doesn't apply because it is titled indemnity. But if you look at 5.3 and 5.1, you'll see that's not quite right. What it really says is it covers breach of representations and warranties. And it applies to representations and warranties originating in Article II, the very thing they claim the breach of. So the, the issue is, if it's a representation and warranty, who can breach it? Only the person who made it. The person that made it was JBA. So clearly this applies. Second thing, there is a statute of limitations in 5.3. The Court made affirmative findings on that, that the case wasn't brought within one year, which it required, one year of the anniversary date of the closing. And we know what happened. They not only did not bring a claim, although they had discussed perhaps fraud, and I'm going to mention one thing out of turn, but I just have to. Sidney said that she suspected that Jim Buckley all along knew that he would not get an assignment. That is not in the record. It is not even in the pleadings. There is no suggestion in the pleadings or requirement under the PSA that consent be obtained first. So that's one. But let me return to the statute of limitations. Roberts. Well, you're, you're good, you're good in argument, and it's a case you know well. But, but before we leave that. Yes, sir. The facts are undisputed that he's texting Mr. Cochran saying we got great news. It's sure looking good. And he's very experienced in this business. And he can't, he can't breach the contract JBE has with QBE. Isn't it a fair inference when he's saying we're the number one vendor and it's going to be really good that everyone would have assumed he was complying with the JBE, the QBE? Absolutely not. Let me explain, Your Honor, because there was detailed testimony about this from people at QBE, too. And this is important. Sir. Even Gomez? Gomez did not speak on this one. He did speak on the issue of number one, which I'll talk about next. But here's what Randy Hardy. Randy Hardy was a guy that had worked with Jim Buckley quite a lot. What had happened at QBE is they combined Balboa and Sterling into one company, making it larger, and that's the reason. And by the way, the termination letter that Ms. Powell referred to goes into detail about that. They changed their business model. They were going to national adjusting firms, not regional like this one was. And they say it's a change in the business model, number one. Number two, it is a termination under 5.1. That's important because that was for no cause whatsoever on 45 days' notice. They could have canceled under 5.2 of the GSA. That was for the sale of JBA's assets. They didn't. They could have canceled under 21.1 for failure to give consent. They didn't. It was a 5.1. So in answer to I think there were two questions on this, the answer one to, well, is that the reason they breached? No. Certainly that could not be it. Back to your question, though. Randy Hardy was who was Jim's friend and was the person that was sending him business to Balboa, was appointed to be the head claims guy of the combined companies. Jim thought that was good news, and I would too. But what happened is and what everybody from QBE testified to was this. They didn't tell anybody they were going to change their adjusting strategy because they were terrified about that. They thought that it might cause loss of business and other types of things. And their vice president, Jeff Anderson, testified specifically for that that no one would know. So, in fact, the first time Buckley found out is when he did talk to Randy Hardy later, but it was good news for him up front. The statute of limitations kills the contract case, and they're asking for affirmative relief on that. And there is no, there can be no doubt about that. 2.4 years or 2 years and 4 months is when they bring the claim. They had to bring it within one year. Discovery rule never raised, but it wouldn't work anyway because the testimony was that Mr. at that immediately after closing. So that kills that issue completely. Now, the other thing that Ms. Powell said is, well, that was denied on summary judgment, and they didn't appeal it. Not true. Here's what happened. It was, Sidney's right about one thing, it was denied on summary judgment up front. During the trial on the last day, and this is a record on appeal 5886 and 87, Judge Beery is hearing about the statute of limitations time bar, and he says, hey, why wasn't that in your summary judgment? And this is all on the record. We said, Judge, it was. And he said, well, I missed it. And he said, well, there could have been a fact issue about Discovery, I'm quoting from him now, in timing, whatever it was. But at any rate, it's now before the Court on the merits as opposed to summary judgment. And then he looks to the opposing counsel representing Mr. Cochran and says, and I would like to hear from you about that. He then proceeded to make affirmative findings of fact in our favor on the statute of limitations. They are not attacked on evidentiary grounds. I think that part is completely over. There is an attack, if you will see in reply brief, and no one mentioned this, but I want to make sure that we get this out and deal with it. There is an attack on Judge Beery adopting findings of fact pretty much from our finding of fact. There is a legal and factual explanation for that that is not in the other side's brief. Factually, Judge Beery at the end of the trial said, is everybody comfortable with their findings of fact and conclusions of law? If you'd like to amend, if you'd like to supplement, I would like to have those before I make my ruling. They didn't do anything. That's the factual basis. The legal basis is this. They cite two cases, Amstar v. Domino's Pizza, which does condemn the fact of incorporating findings of fact without purging them, I guess is maybe the proper word, and Falcon Construction Company, but neither of those cases, neither of those cases stand for the proposition that if it isn't done that way, you're forgiven from attacking the individual findings of fact and conclusions of law. In fact, in the Falcon case that they cite, Judge Rubin, writing for a unanimous panel, points that out. He said, really what you're asking us to do is review this de novo, and that's not appropriate. The standard is well known. We are not changing the standard. Relying on Anderson v. City of Bessemer, which is Mr. Justice White's opinion on the same issue, saying it's not always appropriate, but sometimes it can be. And judges, in the midst of doing their business, sometimes do those things, and that's okay. Alito, do you want to reach the severance pay question? Isn't the contract fairly clear that if he doesn't submit a release, he can't get severance pay? No, sir. It's not. And let me tell you why. They terminated for cause. And let there be no doubt about that. And they had a chance to amend this four times. They first, they terminate him in February. On March 21st, their lawyer writes a letter saying, let there be no doubt about it, this is a termination for cause, and that's in the record. That's Exhibit 27. And then requested, both sides requested findings of fact that it was a termination for cause. And the release is only important if it's a termination without cause. That's the only time a release is required. That's the text of the agreement? I thought it was. That is, that is in the, that's the PSA agreement, the employment agreement attached to the PSA. It's not a conjunctive? No matter what, you've got to submit the release to be able to get the severance? No. And, Your Honor, the second thing, more importantly, is under Rule 8, they had to plead that in any event in avoidance, and they didn't. We pled waiver of that very provision as well. And they really sort of changed horses in midstream on that, trying to make it an involuntary, I mean, excuse me, a termination without cause, and that's just inappropriate. Briefly, let me, I'm going to return to the question you asked me first. And that is about 2.3 and 4.2. I do think Lone Star Fund answers this case. I don't think there's any doubt about it. There is no doubt that they thought 4.2 was a cure for 2.3. In their original complaint, they say that, and they go into detail of saying that you have to do this and replace the business. By the way, that's the real reason for the termination letter for cause. Same thing, you have to do a 4.2 cure. We read the cure to be you replace that business. But 4.2 didn't say that. 4.2 said use commercially best efforts to do it, and no one disputes that he did. Finally, IAS got all the commercially reasonable efforts. Did he find replacement business or try to get the business? Tried to play both. He did try to get the business. He tried. In fact, the record, if you look at Exhibit 28, is a series of claims they did get some additional business, 20 in one month, 12 in another. Not a whole lot, but they got some. So we got the business finally. And very important, replaced it with a tremendous amount of other business estimated from just one client alone between $75,000 and $100,000 a month. So no breach there either. We would ask you to affirm the judgment, and I'll, unless there are any questions, I'll sit down. Thank you. Howell. First, the Lone Star case on which he relies is dispositive is not cited in their brief, nor was it the subject of a Rule 28J letter. So we would request the opportunity to follow Rule 28J to respond to the applicability of that case. I haven't even read it. It's not in the table of authorities. I was wondering why I didn't know it either. Yes, sir. That's why. 2.3 is dispositive of this issue because under 2.3E, as soon as Mr. Buckley came to the table and signed this contract that contains 2.3, he violated and conflicted and resulted in a breach of, constituted a default under, or resulted in acceleration or created in any other party being QBE the right to accelerate, terminate, modify, or cancel the other agreement, the QBE agreement. This is what the entire case turns on because QBE was undisputedly the material client for the business. Their own experts said that without QBE, there was no business. This probably got resolved at trial, and I was curious. Why didn't Cochran call? If QBE is so vital, why didn't he call them? Did that come up at trial? No. Why didn't he call to verify? Because people from QBE testified that they knew the business was material and that Maybe it didn't come up at trial, but if they're about to purchase JBE almost entirely to get the QBE business, wouldn't it be just basic due diligence to call QBE and say we're going to get you, right? That's a solid relationship. Why would you just rely on one person saying we've been there, number one? Well, we asked to talk to QBE before the deal closed, and Mr. Buckley denied it. And their position that the NDA controls this is an absolute red herring. The NDA exists to protect the confidential information of IAS and JBA. It has nothing to do with QBE. It doesn't extend to them at all. You could have called. No, we couldn't because he said we couldn't. I mean, they were his client, and he said we couldn't talk to them. You would have had to have explained why you were calling, which would have breached the confidentiality agreement. No, because the confidentiality addressed only confidential business information like trade secrets, and the definition of confidential information in that would not have extended to a purchase or a takeover? I don't think so. That's not the way it reads. Did you have a chance to check about the time bar question? I did to some extent. We definitely briefed it. But did you win it at summary judgment? I believe we won it on summary judgment. It did eke back into the trial in some way, and so we briefed it. It's in our reply brief, and that is an indemnification provision that applies only to third-party indemnification issues. All right. That's going to be maybe a tricky little issue. What about his statements, because your time is running out, his answer to the release and the severance pay? The way I read the release, it's required not only to get severance pay. It's required before each and every installment, and it was so important to the agreement that it was attached to the employment agreement to begin with. So he certainly had it. I do believe we fired him for cause. There was ample cause to fire him in terms of all the misrepresentations that were made and the breach of 2.3. But in any event, he had to choose between suing and getting severance pay. I don't see any way that he gets both. They knew they needed a consent because Buckley himself had signed a consent to allow Bank of America to give its business to QBE just a couple of months before, and in the course of dealings of these parties. And he signed that consent for them almost a month before the transaction went through. So it was standard practice for people to get the consents to do the assignments before the contract was issued. Otherwise, you're in material breach of the contract when you sign it. And that is the essence of the contract. There's no way we would have agreed to proceed with this transaction if we had known that he was violating the QBE contract the minute he signed this one and this contract also, both of them. So we ask the Court to reverse in its entirety and reinstate our fraud claim and render for us on breach of contract. Thank you. We'll take a 15-minute recess.